**10-40221**

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

---

UNITED STATES OF AMERICA
Plaintiff – Appellee

v.

OZIEL CARDENAS-GUILLEN
Defendant – Appellee

v.

HEARST NEWSPAPERS, L.L.C., doing business as Houston Chronicle
Intervenor – Appellant

---

On Appeal from the United States District Court for
the Southern District of Texas, Brownsville Division
Criminal Action No. 00-CR-118; Miscellaneous Action No. 10-MC-002

---

### BRIEF OF APPELLANT

---

Jonathan R. Donnellan
Ravi V. Sitwala
**The Hearst Corporation**
300 West 57th Street
New York, New York 10019
(212) 649-2020

**ATTORNEYS FOR APPELLANT**

## <u>CERTIFICATE OF INTERESTED PERSONS</u>

Case Number 10-40221
_____

UNITED STATES OF AMERICA
Plaintiff – Appellee

v.

OZIEL CARDENAS-GUILLEN
Defendant – Appellee

v.

HEARST NEWSPAPERS, L.L.C., doing business as Houston Chronicle
Intervenor – Appellant
_____

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

Here list names of all such persons and entities and their connection and interest:

**A.     Parties:**

**Intervenor – Appellant:**

Hearst Newspapers, LLC d/b/a Houston Chronicle
                              Counsel of Record:
                              Jonathan R. Donnellan
                              Ravi V. Sitwala

i

The Hearst Corporation
300 West 57th Street
New York, New York 10019

Hearst Newspapers, LLC is subsidiary of the Hearst Corporation.  The Hearst Corporation is not publicly traded.

**Plaintiff – Appellee:**

United States of America

Counsel of Record:
Amy Howell Alaniz
   Assistant U.S. Attorney
U.S. Attorney's Office
Southern District of Texas
Suite 600
1701 W. Highway 83
McAllen, TX 78501-0000

James Lee Turner
   Assistant U.S. Attorney
U.S. Attorney's Office
Southern District of Texas
P.O. Box 61129
Houston, TX 77208-1129

**Defendant – Appellee:**

Oziel Cardenas-Guillen

Counsel of Record:
Crispin Quintanilla, III
Garcia, Quintanilla & Palacios
5526 N. 10th Street
McAllen, TX 78504-0000

Michael Wayne Ramsey
2120 Welch
Houston, TX 77019-0000

Roberto Jose Yzaguirre
Yzaguirre & Chapa
Suite A
6521 N. 10th
McAllen, TX 78504-0000


_____ /s/ Ravi V. Sitwala _____
Attorney of Record for Appellant
Hearst Newspapers, LLC d/b/a Houston Chronicle

## <u>REQUEST FOR ORAL ARGUMENT</u>

Hearst Newspapers, LLC d/b/a The Houston Chronicle requests oral argument in light of the important constitutional issues presented in this appeal.

# **TABLE OF CONTENTS**

**Page**

CERTIFICATE OF INTERESTED PERSONS ........................................................i

REQUEST FOR ORAL ARGUMENT ................................................................iv

TABLE OF AUTHORITIES ...........................................................................vi

JURISDICTIONAL STATEMENT ....................................................................1

STATEMENT OF THE ISSUE.........................................................................2

STATEMENT OF THE CASE..........................................................................2

STATEMENT OF RELEVANT FACTS .............................................................4

SUMMARY OF THE ARGUMENT ................................................................11

STANDARD OF REVIEW ............................................................................13

ARGUMENT .............................................................................................14

      The District Court Disregarded Constitutionally Required
      Procedures in Closing the Sentencing Hearing Without Notice
      or an Opportunity for the Public and the Press to Be Heard .........................14

          A.    The First Amendment Right of Access
               to Criminal Proceedings Is Secured by
               Fundamental Procedural Protections ........................................14

          B.    The District Court Flagrantly Denied
               the Chronicle's Procedural Rights ...........................................23

CONCLUSION ..........................................................................................40

CERTIFICATE OF SERVICE .......................................................................41

CERTIFICATE OF COMPLIANCE.................................................................42

# TABLE OF AUTHORITIES

**Page**

## CASES

*Abrams v. United States*, 250 U.S. 616 (1919) .......................................32n

*Application of NBC*, 828 F.2d 340 (6th Cir. 1987)...................................16

*Bose Corp. v. Consumers Union of United States, Inc.*,
   466 U.S. 485 (1984)...............................................................................13

*Brandenburg v. Ohio*, 395 U.S. 444 (1969) ...........................................32

*Cohen v. California*, 403 U.S. 15 (1971)................................................31

*Davis v. E. Baton Rouge Parish Sch. Bd.*,
   78 F.3d 920 (5th Cir. 1996) .............................................................1, 2

*Duncan v. Louisiana*, 391 U.S. 145 (1968) ............................................16

*Gannett Co. v. DePasquale*, 443 U.S. 368 (1979)...................................19

*Globe Newspaper Co. v. Superior Court*, 457 U.S. 596 (1982).................17, 19, 27

*Hess v. Indiana*, 414 U.S. 105 (1973).....................................................32

*Hudson v. Chi. Teachers Union Local No. 1*,
   743 F.2d 1187 (7th Cir. 1984) ...........................................................22

*In re Associated Press*, 162 F.3d 503 (7th Cir. 1998) ............................21

*In re Herald Co.*, 734 F.2d 93 (2d Cir. 1984)........................................20

*In re Knight Publ'g Co.*, 743 F.2d 231 (4th Cir. 1984) ..........................20

*In re Oliver*, 333 U.S. 257 (1948)........................................................12

*In re Providence Journal Co.*, 293 F.3d 1 (1st Cir. 2002).......................31

**Page**

*In re Wash. Post Co.*, 807 F.2d 383 (4th Cir. 1986) ........................................ *passim*

*Malinski v. New York*, 324 U.S. 401 (1945) ...........................................................21

*McNabb v. United States*, 318 U.S. 332 (1943)................................................12, 21

*Presley v. Georgia*, 130 S. Ct. 721 (2010)...........................................................15, 18

*Press-Enterprise Co. v. Superior Court*, 464 U.S. 501 (1984)....................15, 17, 18

*Press-Enterprise Co. v. Superior Court*, 478 U.S. 1 (1986)............................ *passim*

*Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555 (1980)....................... *passim*

*Speiser v. Randall*, 357 U.S. 513 (1958) ................................................................22

*Tinker v. Des Moines Indep. Community School Dist.*,
     393 U.S. 503 (1969)......................................................................................31

*United States. v. Alcantara*, 396 F.3d 189 (2d Cir. 2005) ................................17, 20

*United States v. Brooklier*, 685 F.2d 1162 (9th Cir. 1982).....................................19

*United States v. Chagra*, 701 F.2d 354 (5th Cir. 1983)..........................................16

*United States v. Cojab*, 996 F.2d 1404 (2d Cir. 1993) ......................................16, 20

*United States v. Criden*, 675 F.2d 550 (3d Cir. 1982) ............................................19

*United States v. Edwards*, 823 F.2d 111 (5th Cir. 1987)................................ *passim*

*United States v. Eppinger*, 49 F.3d 1244 (7th Cir. 1995) .......................................17

*United States v. Gerena*, 649 F. Supp. 1179 (D. Conn. 1986) .............................38n

*United States v. Martin*, 746 F.2d 964 (3d Cir. 1984).............................................31

**Page**

*Va. Dep't of State Police v. Wash. Post*,
   386 F.3d 567 (4th Cir. 2004) ...............................................................13

*Waller v. Georgia*, 467 U.S. 39 (1984).......................................15, 18, 25

*Whitney v. California*, 274 U.S. 357 (1927) .........................................32n

## RULES & STATUTES

U.S. Const. amend. I ........................................................................ *passim*

18 U.S.C. § 3231 .................................................................................1

18 U.S.C. § 3553 ...............................................................................17

28 U.S.C. § 1291 .................................................................................1

Fed. R. Evid. 201 .............................................................................34n

## OTHER AUTHORITIES

C. Thomas Dienes et al., Newsgathering and the Law § 3.01[1]
   (3d ed. 2005) ...............................................................................17

Henry P. Monaghan, First Amendment "Due Process,"
   83 Harv. L. Rev. 518 (1970) .............................................................23

# JURISDICTIONAL STATEMENT

The district court had subject matter jurisdiction over this criminal action pursuant to 18 U.S.C. § 3231.  This appeal is from several orders that disposed of requests for relief by appellant Hearst Newspapers, LLC d/b/a The Houston Chronicle.  The written orders appealed from are dated February 24, 2010 and February 26, 2010, and are expressly denoted "final" and "immediately appealable."  The oral orders appealed from were issued at a hearing on February 24, 2010, and are memorialized in a written order unsealed after the hearing.  All of the appealed-from orders – orders concerning closure of court proceedings – are collateral orders that may be appealed even if considered interlocutory.  *See Davis v. E. Baton Rouge Parish Sch. Bd.*, 78 F.3d 920, 926 (5th Cir. 1996) ("[M]embers of the news media, although not parties to litigation, can appeal court closure orders or confidentiality orders under the collateral order doctrine.").  Appellant filed a timely notice of appeal on March 9, 2010.  This court has jurisdiction over the district court's orders concerning access to judicial proceedings pursuant to 28 U.S.C. § 1291 and the collateral-order doctrine.  *See United States v. Edwards*, 823 F.2d 111, 114 (5th Cir. 1987).  The issues presented are not moot because they are capable of repetition, yet evading review.  *Id.* (citing *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 563 (1980)).  Appellant's standing to raise the issues presented has never been questioned and the district court granted Appellant's

motion to intervene.  *See Davis*, 78 F.3d at 927 (holding that media had standing to challenge confidentiality order).

## STATEMENT OF THE ISSUE

Whether the district court violated the public's First Amendment right of access to Defendant's sentencing proceeding by refusing to follow the procedural requirements that make the right enforceable, including denying Appellant's request for notice and an opportunity to be heard prior to closure of proceedings, conducting all hearings related to sentencing in secret, posting "notice" of such hearings only after they concluded to ensure the press and public would not attend or challenge closure, and refusing to hear objections to closure even when those efforts failed and counsel for Appellant appeared at court prior to commencement of sentencing.

## STATEMENT OF THE CASE

This is an appeal from a series of decisions by the district court calculated to deny the public access to the proceedings and records of this criminal action, and to allow adjudication of the case in secret.  So comprehensive was the secrecy surrounding this case that the public did not know, and had no way of knowing, that Defendant had pleaded guilty or was to be sentenced when that day came.  The court in fact took affirmative steps to ensure that the public would have no advance notice of the sentencing hearing or be able to challenge its closure, violating

procedural requirements of the First Amendment right of access that are fundamental and necessary to ensure the enforceability of that right. This level of secrecy was accomplished by wholesale sealing of most documents, which the court allowed without any consideration of the public's right of access, and refusing to give advance notice of any hearings, so that the public could not attend or challenge closure.

Specifically at issue on this appeal are orders denying Intervenor-Appellant Hearst Newspapers, LLC d/b/a Houston Chronicle (the "Chronicle") notice of contemplated court closures and an opportunity to he heard on closure. The district court denied the Chronicle's request for notice and an opportunity to be heard and went a step further, ordering during a closed hearing that public notice of Defendant's sentencing hearing be posted only *after* the sentencing had concluded, a decision that was designed to ensure the court's closure order would not be challenged. When the Chronicle learned of the sentencing notwithstanding these efforts, and its lawyer showed up at court to challenge closure of the sentencing, the district court nonetheless refused to hear those objections. It later denied the Chronicle's request to be heard as "moot," having created the claimed mootness through its own inaction.

## STATEMENT OF RELEVANT FACTS

In 2007, the United States took custody of Oziel Cardenas-Guillen ("Cardenas-Guillen" or "Defendant"), the former head of the Gulf Cartel. (Record Excerpts ("R.E.") Tab J at R. USCA5 75)[1] Defendant was charged with being involved in conspiracies to distribute large quantities of marihuana and cocaine, violation of the continuing-criminal-enterprise statute, commonly known as the "drug kingpin statute," and threatening federal officers, among other things. (R.E. Tab D at R. USCA5 32-52) According to the Government, Defendant "is widely believed to be partly responsible for the ongoing drug trafficking wars and 'bloodbaths' along the Mexican border, resulting in the deaths of approximately 2000 people." (R.E. Tab J at R. USCA5 75) The case was assigned to Judge Hilda Tagle in the Brownsville Division of the Southern District of Texas.

Early on in the case, the Government moved to transfer venue from Brownsville to Houston, citing, among other things, concerns over courtroom security in Brownsville, due to its proximity to the Mexican border. (R.E. Tab J at

---

[1]    Record Excerpts are cited as "R.E. Tab [tab number] at [record and page number]." Citations to materials in the record not included in the Record Excerpts are cited as follows: (1) pages in the Record on Appeal from the criminal case (No. 1:00-CR-118-1) are cited as "R. [record page number]"; (2) pages in the Supplemental Record on Appeal from the criminal case are cited as "Supp. R. [record page number]"; and (3) pages in the Record on Appeal from the miscellaneous case (No. 1:10-MC-2) are cited as "Misc. R. [record page number]." Note that the vast majority of the citations in this brief are to the original criminal record and not the supplemental or miscellaneous record.

R. USCA5 72-82)  The Government explained that "there is good cause for concern for the general security of court personnel and other necessary personnel and civilians, to include prospective jurors, in the event that this case was litigated in the Brownsville Division."  (*Id.* at USCA5 77)  Accordingly, the Government moved for transfer noting that "the United States Marshal's Service (USMS) is of the opinion that a transfer of the case from the Brownsville Division to the Houston Division would best suit its needs and responsibilities."  (*Id.* at USCA5 80)  Included with the motion was a letter from USMS concluding that:  "Houston presents the best option for USMS personnel to safely, adequately, and securely meet all the needs and perform all the duties associated with the trial of the Cardenas-Guillen case.  Even with respect to Houston, additional USMS personnel will be requested from other USMS Divisions to assist with Houston-area transportation and security concerns."  (*Id.* at USCA5 85)  The motion and the letter, like most filings in the case, was made under seal, and not unsealed until February of this year following sentencing, three years after it was filed.  The district court, after receiving no opposition from Defendant, granted the transfer motion – directing that the court would hear the case in Houston.  (R. USCA5 129-33)

The case proceeded slowly, with Defendant requesting and receiving several unopposed continuances.  (Crim. Docket Entry Nos. 91, 103, 114, 122, 126, 130,

R.E. Tab A at Supp. R. USCA5 10-13)  In March 2009, the pace of filings appears to have picked up after the district court terminated all deadlines in the case (*Id.* at Supp. R. USCA5 14), but it was impossible to discern what was transpiring at the time because almost all filings were made under seal (*see id.* at Supp. R. USCA5 14-16).  In many instances, the documents appear to have been sealed unilaterally by the parties, without any findings or indeed any action whatsoever by the court. (*See, e.g.*, *id.* at Supp. R. USCA5 10, 14, 16, Crim. Docket Entry Nos. 94, 181, 228-30)  For some filings, the parties did move for sealing but only offered conclusory reasons and generic orders, which the court entered.  (*See, e.g.*, R. USCA5 162-66)

On October 30, 2009, the Chronicle sent a letter to the court requesting that the record be unsealed and that proper procedures be followed with respect to courtroom closure and document sealing going forward.  (R. USCA5 275-80) Among other things, the Chronicle sought notice of proposed closure or sealing and an opportunity to be heard.  (R. USCA5 275)

In response to the letter, the court recognized the Chronicle's right of access and ordered the parties to submit reasons why previously sealed documents should remain under seal.  (R. USCA5 228-29)  The court also laid out procedures for future closure and sealing.  (*Id.*; R. USCA5 238-39)

After getting an "unopposed" extension to file the statements regarding continued sealing of previously sealed documents, the parties filed substantially identical filings.[2] (*Compare* R. USCA5 240-47, *with* R. USCA5 248-67)  The parties conceded that several documents did not need to remain sealed, but insisted that many others did until the conclusion of the case.  (*See* R. USCA5 256-66)  The statements simply recited general interests – Defendant's fair-trial right, ongoing investigations, and third-party safety – but did not explain with any specificity how disclosure of the documents would jeopardize those interests.  (*See id.*)  The Government filed a separate sealed memorandum purporting to explain in detail why sealing was necessary.  (*See* R. USCA5 265)

On February 9, 2010, in response to the statements, the Chronicle moved to intervene and requested that the uncontested documents be unsealed immediately, that the docket be updated to provide the title or some other meaningful description of the sealed documents to allow the public to appreciate the nature of the documents, that the Government's sealed memoranda be unsealed at least in redacted form to allow the Chronicle to respond, and that the court narrowly tailor any sealing through redaction and enter specific on-the-record findings as to any documents or portions thereof that it maintains under seal.  (R. USCA5 268-73)

---

[2]     The motion was unopposed in the sense that neither the Government nor the Defendant opposed it.  The Chronicle would have opposed it but was not a party at the time as it had not yet moved to intervene, and neither party sought the Chronicle's position on the motion.

The court unsealed the uncontested documents in an order dated February 12, 2010, but reserved ruling on the remaining requests until after the case concluded. (R. USCA5 282)

Unbeknown to the Chronicle, the Government moved on February 18, 2010 to close Defendant's sentencing hearing – the public at that point was unaware that Defendant had pleaded guilty – and moved also to deprive the public of notice that the hearing was even taking place.  (R. USCA5 345)  The following day, the court, without giving the public or the Chronicle notice or an opportunity to be heard on the question, granted the motion in a sealed order with conclusory findings justifying the order.  (R.E. Tab E at R. USCA5 292-93)  The order expressly stated it shall not be unsealed until after the sentencing hearing took place.  (*Id.*; *see also* R.E. Tab L at R. USCA5 312)  The court also appears to have stricken the motion from the record after granting it, preventing the public from ever having access to it.  (R. USCA5 295.  *But see* R.E. Tab L at R. USCA5 312 (noting that the materials would be maintained under seal))

The court secretly scheduled the sentencing for February 25, 2010.  (*See* R.E. Tab I at R. USCA5 346)  Apparently, a local television station learned the date of the secret sentencing hearing, and it began making inquiries as to whether the February 25 "trial" was in fact taking place.  (*Id.*)  In response, the court secretly rescheduled the sentencing for February 24.  (*Id.*)  When the hearing was being

initiated, a Chronicle reporter happened upon the closed courtroom and attempted to gain admission to no avail. (*See* R.E. Tab L at R. USCA5 310) A lawyer for the Chronicle quickly joined him and sought to be heard on the closure. (*See* Misc. R. USCA5 17) The court was well aware of these happenings, and even stated "for the record," prior to moving to the substance of the hearing, that "in spite of all the efforts to ensure that this hearing not be noticed by the media, I am told that there is a reporter from the Houston Chronicle who is, as I speak, drafting a motion regarding his request to be heard – or to be present during the – the hearing." (R.E. Tab L at R. USCA5 310) But instead of hearing the motion, the court continued with the hearing behind closed doors. (*Id.*) Only afterwards did the court deny the Chronicle's motion to be heard – and, remarkably, it denied the motion as moot even though that conclusion was possible only because of the court's refusal to hear the motion prior to the sentencing. (R.E. Tab F at R. USCA5 373) The court also noted in its denial that opening the hearing "would have resulted in a substantial probability that the safety of a third party of the defendant would be placed in danger," notwithstanding the U.S. Marshals Service's prior position that it could secure the proceedings if transferred to Houston. (*Id.*) The transcript of the hearing was released once it was prepared by the reporter. (*See* R.E. Tab L at R. USCA5 312)

Because the sentencing concluded the case, the Chronicle moved to unseal all records, given the Government's previous representation that all the sealed materials it submitted could be unsealed when the case concluded (with the exception of one document, which the Government claimed could only be released in redacted form).  (R. USCA5 326-28)  The court ruled on the remainder of the Chronicle's previous requests on February 26, 2010, finding that many documents could be unsealed, but some could remain under seal "in perpetuity."  (R.E. Tab G at R. USCA5 334-35)  The court denied the Chronicle's motion for meaningful docket entries with respect to sealed filings, explaining that it was not necessary and would frustrate the purpose of sealing, without explaining how.  (*Id.* at R. USCA5 335)  It also denied the Chronicle's request for notice of contemplated closure and an opportunity to be heard, finding that notice "is not required" and "requiring that the intervenors be granted an opportunity to be heard would frustrate the purposes of sealing the hearing."  (*Id.* at R. USCA5 336)  The court apparently offered more-detailed reasons for its decision in a sealed filing.  (*Id.*)

A review of the unsealed documents reveals that many (if not all) never should have been sealed.  For example, Defendant moved to unseal a transcript for the limited purpose of reviewing it to propose redactions, and the court sealed the motion along with its order granting the motion, finding that sealing was necessary to protect the Defendant's fair-trial right and ongoing government investigations,

even though the documents contain nothing of substance. (*See* R. USCA5 283-91) Similarly, the motion to transfer and order granting the motion were sealed for no apparent reason. (*See* R.E. Tab J at R. USCA5 72-81)

The Chronicle timely appealed the district court's orders denying the Chronicle fundamental procedural protections in an attempt to thwart the public's right of access to criminal proceedings secured by the First Amendment to the Constitution. (R.E. Tab B at R. USCA5 361-62)

## SUMMARY OF THE ARGUMENT

The district court flagrantly disregarded the public's First Amendment right of access to criminal proceedings in a conscious effort to prevent the public and the Chronicle from even attempting to exercise their rights or seek relief from this Court. This was done in order to allow the Government to complete the prosecution of a high-profile drug kingpin under a cloak of secrecy. The secret proceedings resulted in only a 25-year sentence based on a plea deal for a man the district court recognized as responsible for untold violence and death, prompting the court to express misgivings over the term. The disconnect between Defendant's deeds and his sentence, imposed as it was in secret, is a potent reminder of the policy concerns that underlie the right of access: "A result considered untoward may undermine public confidence, and where the trial has been concealed from public view an unexpected outcome can cause a reaction that

the system at best has failed and at worst has been corrupted." *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 571 (1980). "People in an open society do not demand infallibility from their institutions, but it is difficult for them to accept what they are prohibited from observing." *Id.* at 572. The secret proceedings in this case raise the specter of the Star Chamber and other "institutions obviously symboliz[ing] a menace to liberty" that were anathema to the founders of this country. *See In re Oliver*, 333 U.S. 257, 269-70 (1948).

There are fundamental procedural requirements that must be met prior to any abridgement of the First Amendment right of access. Without them, the access right cannot be enforced and is meaningless. The public must have notice of contemplated closure, an opportunity to be heard on closure, and if the court deems that closure is essential to preserve a value higher than the First Amendment and no reasonable alternative to closure exists, it must make specific, on-the-record findings justifying closure. This case illustrates how critical these procedural requirements are, as without strict fidelity to them there is no right of access at all. As Justice Frankfurter explained, "[t]he history of liberty has largely been the history of observance of procedural safeguards." *McNabb v. United States*, 318 U.S. 332, 347 (1943). This is particularly true when it comes to enforcing the First Amendment right of access, where the public by definition lacks access to information about the matters sought to be closed or sealed. By choosing to ignore

the procedures and secretly adjudicate the case, the court left the public with no recourse and irreparably harmed the public's First Amendment right.

The district court in this case failed to give public notice of Defendant Cardenas-Guillen's sentencing hearing, or to allow interested parties to contest closure of that hearing.  Instead, at the parties' urging, the court purposefully concealed the time and place of the hearing so as to avoid any detection by the public and the press, and even when the press happened upon the hearing and demanded to be heard, the court refused to hear the press.  These actions clearly violated the First Amendment.

## STANDARD OF REVIEW

The district court's decisions concerning the First Amendment right of access to criminal proceedings are reviewed de novo.  *See, e.g.*, *Va. Dep't of State Police v. Wash. Post*, 386 F.3d 567, 575 (4th Cir. 2004) ("We review a district court's decision concerning access under the First Amendment de novo."); *see also Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 499 (1984) ("[I]n cases raising First Amendment issues [the Supreme Court] ha[s] repeatedly held that an appellate court has an obligation to make an independent examination of the whole record in order to make sure that the judgment does not constitute a forbidden intrusion on the field of free expression.").

# ARGUMENT

## THE DISTRICT COURT DISREGARDED CONSTITUTIONALLY REQUIRED PROCEDURES IN CLOSING THE SENTENCING HEARING WITHOUT NOTICE OR AN OPPORTUNITY FOR THE PUBLIC AND THE PRESS TO BE HEARD

The district court denied the Chronicle's request for notice and an opportunity to be heard regarding the closure of hearings in the case. It also took purposeful efforts to deprive the Chronicle of notice of Defendant's sentencing hearing. And even after those efforts were unsuccessful and the Chronicle moved to open the hearing, it still refused to hear the Chronicle's objections to closure of the hearing. All of these actions violated the First Amendment's procedural safeguards of the fundamental American right to attend criminal proceedings. The district court's actions struck at the very heart of the access right, rendering it unenforceable through disregard for the First Amendment's procedural requirements. The court cannot constitutionally avoid scrutiny by takings steps to prevent the public from even attempting to exercise its substantive right.

## A. The First Amendment Right of Access to Criminal Proceedings Is Secured by Fundamental Procedural Protections

The Supreme Court has repeatedly recognized a broad First Amendment right of access to criminal proceedings. Beginning with *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555 (1980), the Court has crafted a constitutional standard for access focused on the "history and logic" of public access to the proceedings at issue. Applying that test, the Court has held there is a constitutional

14

right of access to all phases of criminal proceedings it has considered, including jury voir dire hearings, pretrial suppression hearings, pretrial preliminary hearings, and trials. *See Richmond Newspapers*, 448 U.S. 555 (trial); *Press-Enterprise Co. v. Superior Court* (*Press-Enterprise I*), 464 U.S. 501 (1984) (jury voir dire); *Waller v. Georgia*, 467 U.S. 39 (1984) (suppression hearings); *Press-Enterprise Co. v. Superior Court* (*Press-Enterprise II*), 478 U.S. 1 (1986) (preliminary hearings). Just this term, the Court reaffirmed this right of access. *Presley v. Georgia*, 130 S. Ct. 721, 723 (2010) ("[T]he *voir dire* of prospective jurors must be open to the public under the First Amendment.").

Access to criminal proceedings is a fundamental First Amendment right grounded in critical policy interests, most notably ensuring fairness and public confidence in the adjudicative system. In *Press-Enterprise I*, the Court explained:

> The value of openness lies in the fact that people not actually attending trials can have confidence that standards of fairness are being observed; the sure knowledge that anyone is free to attend gives assurance that established procedures are being followed and that deviations will become known. Openness thus enhances both the basic fairness of the criminal trial and the appearance of fairness so essential to public confidence in the system.

464 U.S. at 508. Openness "has long been recognized as an indispensable attribute of an Anglo-American trial." *Richmond Newspapers*, 448 U.S. at 569. The Court went on to explain:

> It is not enough to say that results alone will satiate the natural community desire for "satisfaction." A result considered untoward

> may undermine public confidence, and where the trial has been concealed from public view an unexpected outcome can cause a reaction that the system at best has failed and at worst has been corrupted. To work effectively, it is important that society's criminal process satisfy the appearance of justice, and the appearance of justice can best be provided by allowing people to observe it.

*Id.* at 571-72 (citation and quotations omitted).

Based on this understanding, the Court in *Press-Enterprise II* held that the First Amendment access right applies to all aspects of court proceedings unless they "would be totally frustrated if conducted openly," citing grand-jury proceedings as the single example of a proceeding that would be frustrated by openness. *Press-Enterprise II*, 478 U.S. at 8-9. The Court also emphasized the importance of the right of access to proceedings where no jury is present. *Id.* at 12-13 ("[T]he absence of a jury, long recognized as 'an inestimable safeguard against the corrupt or overzealous prosecutor and against the compliant, biased, or eccentric judge,' makes the importance of public access . . . even more significant.") (quoting *Duncan v. Louisiana*, 391 U.S. 145, 156 (1968)).

The Supreme Court's repeated and emphatic pronouncements in favor of public access to criminal proceedings have led other courts to hold that the First Amendment access right attaches to virtually all aspects of those proceedings, from beginning to end. *See, e.g.*, *United States v. Chagra*, 701 F.2d 354 (5th Cir. 1983) (bail-related hearings); *United States v. Cojab*, 996 F.2d 1404, 1405 (2d Cir. 1993) (unspecified pretrial hearings); *Application of NBC*, 828 F.2d 340 (6th Cir. 1987)

(judicial-disqualification and attorney-conflict-of-interest proceedings); *see also* C. Thomas Dienes et al., Newsgathering and the Law § 3.01[1] (3d ed. 2005) ("Today, almost all pretrial proceedings are presumptively open."). In particular, courts have held that the right clearly extends to sentencing hearings. *See, e.g.*, *United States. v. Alcantara*, 396 F.3d 189, 196 (2d Cir. 2005) (noting that "[t]here is little doubt that the First Amendment right of access extends to sentencing proceedings" and, after analyzing the question, concluding that the "First Amendment right of public access attaches to sentencing proceedings"); *accord United States v. Eppinger*, 49 F.3d 1244, 1253 (7th Cir. 1995); *In re Wash. Post Co.*, 807 F.2d 383, 390 (4th Cir. 1986); *see also* 18 U.S.C. § 3553 (requiring certain statements at sentencing to be "in open court").

While the First Amendment access right is not absolute, there is an exceptionally high bar for overriding it and the burden is squarely on the party seeking closure to justify it. The court also has an independent affirmative obligation to safeguard the public's right of access. Closure is permitted only when it "is essential to preserve higher values and is narrowly tailored to serve that interest." *Press-Enterprise I*, 464 U.S. at 510. Speculative concerns, even if serious, cannot trump the access right. *See Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 609-10 (1982). Instead, the court must find based on specific facts that closure is necessary to protect an interest superior to the First

17

Amendment. *See Press-Enterprise I*, 464 U.S. at 510. To satisfy the narrow-tailoring requirement, the court must find that no reasonable alternatives to closure exist. *Id.* In doing so, the court must independently consider alternatives to closure even when none are offered. *Presley*, 130 S. Ct. at 724 ("The conclusion that trial courts are required to consider alternatives to closure even when they are not offered by the parties is clear not only from this Court's precedents but also from the premise that '[t]he process of juror selection is itself a matter of importance, not simply to the adversaries but to the criminal justice system.'") (quoting *Press-Enterprise I*, 464 U.S. at 505). Narrow tailoring also requires that only so much of the hearing as necessary be closed. *See Waller*, 467 U.S. at 48 (holding that "closure of the entire suppression hearing plainly was unjustified" and noting that "[u]nder certain circumstances, . . . interests may well justify closing portions of a suppression hearing to the public").

The constitutional right of access would be worth little without the procedural architecture that gives it structure and ensures its enforceability. This is particularly true given that those seeking access rarely possess sufficient information to challenge a denial without adherence to those procedures. Thus, a set of strict procedural rules have been developed by the courts to give life to the right of access, including requirements of notice of contemplated closure, an

opportunity for interested parties to be heard regarding closure, and the entry of specific factual findings supporting closure in the record.

The Supreme Court has made clear that prior to exclusion of the press and public from a criminal hearing, the press and public "'must be given an opportunity to be heard on the question of their exclusion.'" *Globe*, 457 U.S. at 609 n.16 (quoting *Gannett Co. v. DePasquale*, 443 U.S. 368, 401 (1979) (Powell, J., concurring)); *United States v. Edwards*, 823 F.2d 111, 119 (5th Cir. 1987) (quoting *Globe*). Courts have held that in order for this right to be meaningful, the public and the press are also entitled to notice of contemplated closure, in order to object. In *United States v. Criden*, the Third Circuit held that "due process requires some notice to the public before a trial court may close a pretrial criminal proceeding." 675 F.2d 550, 558 (3d Cir. 1982). It noted that "[t]he press should not be expected to 'camp out' in the hallway in order to ascertain whether evidentiary proceedings are being conducted in chambers." *Id.* at 559. Ultimately, the court, pursuant to its supervisory powers, "require[d] docketing of . . . motions [to close] to be made sufficiently in advance of any hearing on or disposition of the closure motion to afford interested members of the public an opportunity to intervene and present their views to the court." *Id.*

Similarly, in *United States v. Brooklier*, the Ninth Circuit held: "[W]here a closure motion is not filed of record or made in open court, and when, as here, the

court has been made aware of the desire of specific members of the public to be present, reasonable steps should be taken to afford such persons an opportunity to submit their views to the court before exclusion is accomplished." 685 F.2d 1162, 1168 (9th Cir. 1982). The Fourth Circuit has adopted the notice requirements of *Criden* and *Brooklier*. *See In re Knight Publ'g Co.*, 743 F.2d 231, 234 (4th Cir. 1984).

In *In re Herald Co.*, the Second Circuit observed that "it seems entirely inadequate to leave the vindication of a First Amendment right to the fortuitous presence in the courtroom of a public spirited citizen willing to complain about closure." 734 F.2d 93, 102 (2d Cir. 1984). Accordingly, "[s]ome form of public notice should be given, since it is important, perhaps especially so, to afford an opportunity to challenge courtroom closure accomplished in the absence of spectators." *Id.* The court ultimately held that "a motion for courtroom closure should be docketed in the public docket" and, if made under seal, "the publicly maintained docket entries should reflect the fact that the motion was filed, the fact that the motion and any supporting or opposing papers were filed under seal, the time and place of any hearing on the motion, the occurrence of such hearing, the disposition of the motion, and the fact of courtroom closure, whether ordered upon motion of a party or by the Court *sua sponte*." *Id.* at 102-03; *accord Alcantara*, 396 F.3d at 192; *Cojab*, 996 F.2d at 1408.

If after giving notice and hearing any interested parties, a court concludes that closure is necessary and that no less-restrictive alternatives to closure exist, it is required to make specific, on-the-record findings demonstrating why closure is necessary and would be effective. *Edwards*, 823 F.2d at 119 (citing *Press-Enterprise II*); *In re Associated Press*, 162 F.3d 503, 510 n.9 (7th Cir. 1998) (collecting cases requiring specific, on-the-record findings).

Without these procedural protections, the right of access would be a dead letter. Absent notice, the public would not know when or where to exercise its right to attend proceedings. If there were no right to be heard, the public could not defend its right to be present and hold the parties and the court to the high burden that must be satisfied to justify closure. And the requirement of specific, on-the-record findings supporting closure allows for scrutiny of closure decisions and meaningful appellate review. Indeed, the policies underlying these procedures are the same as those underlying the access right itself – to enhance decisionmaking and public confidence in the courts through transparency.

Ignoring the procedural protections does irreparable violence to the right of access – leaving it only an empty shell. Justice Frankfurter succinctly made the point with a truism that applies to virtually all constitutional rights: "The history of liberty has largely been the history of observance of procedural safeguards." *McNabb v. United States*, 318 U.S. 332, 347 (1943); *accord Malinski v. New York*,

324 U.S. 401, 413-14 (1945) (Frankfurter, J., concurring separately) ("The history of American freedom is, in no small measure, the history of procedure."). Accordingly, "[t]he procedures by which the facts of the case are determined assume an importance fully as great as the validity of the substantive rule of law to be applied. And the more important the rights at stake the more important must be the procedural safeguards surrounding those rights." *Speiser v. Randall*, 357 U.S. 513, 520-21 (1958). Nowhere is that more true than with respect to the right of access to criminal proceedings, where the public will almost always lack the information needed to anticipate a closure motion or evaluate the merits of closure. Accordingly, adherence to the procedures is essential to ensure that all arguments are presented and considered, the public interest is fully reviewed, and a well-reasoned decision is issued to the public supported by record evidence. *See Hudson v. Chi. Teachers Union Local No. 1*, 743 F.2d 1187, 1192 (7th Cir. 1984) (Posner, J.) ("Just the danger (as distinct from actuality) of depriving people of the freedom of expression guaranteed by the First Amendment has led courts to invalidate procedures that created the danger."); *see also In re Washington Post Co.*, 807 F.2d at 393 ("We note that our decision does not signify that we conclude that those hearings should have been opened to the public, but simply that we cannot uphold orders based on the use of impermissible procedures and the application of an erroneous standard of law."). *See generally* Henry P. Monaghan,

First Amendment "Due Process," 83 Harv. L. Rev. 518 (1970). When a court disregards these procedural rights, it violates the public trust and undermines public confidence in the justice system.

**B.     The District Court Flagrantly Denied the Chronicle's Procedural Rights**

The district court in this case totally deprived the public of its right to attend the criminal proceedings by disregarding all of the procedural requirements discussed above. It purposefully denied the public of notice of the sentencing hearing so that the public could not even attempt to exercise its right to attend the hearing. And it refused to hear the Chronicle's objections to closure when it moved to be heard at the hearing. The district court's actions calculated to deny the public a fundamental First Amendment right were clear error.

At the outset of its involvement in the case, the Chronicle requested that the district court give notice of hearings and allow the Chronicle to be heard prior to closure of hearings. (R. USCA5 275) Instead, the court, in response to the Government's motion, not only failed to provide notice that the sentencing hearing would be closed, it actually went out of its way to deprive the Chronicle and the public of notice that the hearing was taking place at all. As the court stated during the hearing: "[I]n spite of ***all the efforts*** to ensure that this hearing not be noticed by the media, I am told that there is a reporter from the Houston Chronicle who is, as I speak, drafting a motion regarding his request to be heard – or to be present

during the – the hearing."[3]  (R.E. Tab L at R. USCA5 310 (emphasis added))  The

court refused to hear that very motion to open the hearing and be heard on closure,

and issued an order after the hearing denying the motion as moot – even though the

mootness determination was predicated on the court's own refusal to hear it when

it was made – and summarily noting that opening the sentencing hearing "would

have resulted in a substantial probability that the safety of a third party of the

defendant would be placed in danger." (R.E. Tab F at R. USCA5 373)[4]  Later that

day – hours after the conclusion of the hearing – a "notice" purporting to announce

the setting of the hearing was posted on the docket at the court's direction.  (*See*

R.E. Tab K at R. USCA5 302; R.E. Tab A at Supp R. USCA5 18. Docket Entry No.

247 (giving notice of a 9:30 a.m. hearing on February 24, 2010 at 1:18 p.m. on

February 24, 2010 after the hearing concluded))  Days later, the court formally

denied the Chronicle's original request for notice of hearings and an opportunity to

be heard if closure is contemplated, finding that such notice "is not required" and

---

[3]      The court went on to admonish the parties:  "[T]o the extent that you – when you step outside to make that – the Court's order [permitting family members to enter the hearing] known to the family, please do so without having anybody else . . . know, if at all possible, what's happening."  (*Id.*)

[4]      The issues presented are clearly not moot because they are capable of repetition, yet evading review.  *United States v. Edwards*, 823 F.2d 111, 114 (5th Cir. 1987) (citing *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 563 (1980)).  Obviously, a court may not simply refuse to hear a motion and then declare it moot based on that refusal.  Indeed, even while declaring the matter "moot," the district court recognized that its order was "final and immediately appealable."  (R.E. Tab F at R. USCA5 373)

that "grant[ing] an opportunity to be heard would frustrate the purposes of sealing the hearing." (R.E. Tab G at R. USCA5 369)

The court's actions clearly violated the procedures required by the First Amendment in several ways. The Supreme Court has required that parties be heard on objections to closure as discussed above, and the district court's general conclusion that such a hearing would frustrate the purposes of closure cannot stand in the face of this precedent. *See supra* at 19. It is also illogical – there is no reason why a hearing concerning possible closure would render actual closure ineffective. For example, if the Government fears that identification of cooperating witnesses at a sentencing might jeopardize an investigation or compromise the witnesses' safety, it can explain that in open court and the court can review any sensitive matters *in camera*. And if the court concludes closure is necessary, it can close the sentencing hearing, in whole or in part, as narrowly tailoring requires. Nothing about this commonly used procedure frustrates the purpose of closure. *See In re Washington Post Co.*, 807 F.2d 383, 391 (4th Cir. 1986) (noting that hearings concerning the necessity of closure do not frustrate closure); *see also Waller*, 467 U.S. at 48-49) (noting critically that "[t]he court did not consider alternatives to immediate closure of the entire hearing: directing the government to provide more detail about its need for closure, in camera if necessary, and closing only those parts of the hearing that jeopardized the interests

advanced"). Accordingly, this Court should reverse the district court's order categorically denying the public an opportunity to be heard prior to court closures.

The Court should also reverse the district court's order categorically denying the Chronicle's request for notice of contemplated closure of hearings in the case. As the cases above make clear, the right to be heard on closure is rendered meaningless if there is no corresponding right to notice of closure. *See supra* at 19-21. The district court's conclusory finding that notice is never required guts the right to be heard on closure and in turn the time-honored First Amendment right to attend criminal proceedings. The district court's own action in posting the sham "notice of setting" of the sentencing after it concluded appears to recognize the right to notice, but at the same time totally undermines it.[5] This Court should reverse the denial of notice based on the First Amendment and common-law rights of access, along with its supervisory powers. *See supra* at 19-21.

The court's specific decision to conceal the sentencing hearing is even more troubling. The wholesale concealment of proceedings to which the First Amendment right of access clearly applies deprived the public and the press any opportunity to be heard prior to closure, a deprivation that cannot be justified by any countervailing interests. Nor is it the least-restrictive means of balancing other interests against the access right. Putting aside for a moment the substantive

---

[5]    It is notable that the post-hearing notice also misstates that the hearing will take place in Brownsville, rather than Houston. (R.E. Tab K at R. USCA5 302)

question whether it could ever be constitutional to hold totally secret criminal

proceedings, the court at a minimum should have given notice that the Government

had moved for a secret sentencing and held a hearing on whether circumstances

warranted it in this case if there was an objection.  That procedure would give

interested parties an opportunity to be heard on the question and also an

opportunity to appeal the decision prior to being irreparably harmed through the

deprivation of their procedural and substantive rights without any process.  And it

would in no way compromise the safety interest asserted by the Government.  For

these reasons, the court's decision to grant the Government's motion to withhold

notice of the sentencing hearing should be reversed.

In addition, the court committed reversible error in refusing to hear the

Chronicle's objections to closure during the sentencing hearing.  *See Edwards*, 823

F.2d at 119 ("In requiring a case-by-case resolution of the issues concerning

closure of presumptively open proceedings, the *Globe* Court noted that, for this

approach to be effective, 'the press and general public must be given an

opportunity to be heard on the question of their exclusion.'") (citing *Globe*, 457

U.S. at 610 n.25).  The court's conclusory reasoning that, because the hearing was

in session, recessing to hear the objections to closure would "interfere[] with the

administration of justice" is both unsupported and constitutionally inadequate.  As

an initial matter, the only reason the motion was made after the hearing began is

because the court purposefully kept the public in the dark about the hearing's

existence, which is the antithesis of due process and procedural fairness.  And it is

unclear how allowing the Chronicle to be heard prior to continuing the hearing

would interfere with the administration of justice – the order fails to articulate its

reasoning with the specificity required of a closure order and, in any event, it is

difficult to imagine how evaluation of the public's constitutional right to attend the

sentencing would be considered "interference" with the administration of justice.

It is harder to imagine how the avoidance of that unspecified "interference" is

deemed a higher value than the First Amendment to the Constitution, requiring its

sacrifice.  Indeed, there is no suggestion that closure was necessary to protect

Defendant's Sixth Amendment fair-trial right (nor could there be given the context)

or any other right – there is no competing constitutional interest at all.[6]

---

[6]     Prior to the sentencing, the district court apparently filed a sealed order "sealing" the sentencing hearing because "docketing the sentencing hearing of the Defendant prior to the sentencing hearing, as well as failure to seal the sentencing hearing, will result in a substantial probability that the lives and safety of the Defendant, Court personnel, USMS personnel, other courthouse personnel, and the general public will be placed in danger."  (R.E. Tab E at R. USCA5 292)  While this order was entered without giving notice or giving the public a chance to raise objections and be heard, and is therefore defective for the reasons discussed above, it is also far too conclusory to satisfy the *Press-Enterprise II* standard in any event. *See Press-Enterprise II*, 478 U.S. at 15 ("The First Amendment right of access cannot be overcome by [a] conclusory assertion . . . ."); *see also Edwards*, 823 F.2d at 119 (explaining that *Press-Enterprise II* requires "***specific***, on-the-record, ***factfindings*** demonstrating that a substantial probability exists that an interest of a higher value will be prejudiced and that no reasonable alternatives to closure will adequately protect that interest") (emphases added).

This is not the first time that a court has addressed these issues.  Facing nearly identical facts, the Fourth Circuit reversed a district court's holding of secret plea and sentencing hearings, purposeful denial of notice, and refusal to hear contemporaneous objections.  *See In re Washington Post Co.*, 807 F.2d at 391.  As the court explained in its decision, which this Court cited favorably in *Edwards*:

> The district court here, in making its decisions to close the November 18 [plea] and November 25 [sentencing] hearings in Soussoudis' case, plainly failed to comply with . . . procedural requirements.  No notice of either of the government's two closure motions was given to the public.  Instead, the district court deliberately concealed the motions from the public by causing the omission from the court's docket of any mention of either the motions or the hearings to which they referred.  Moreover, when the Post nonetheless learned of the closure of the plea hearing and sought to voice its objections, the district court denied it any meaningful opportunity to be heard by delaying consideration of its request until after the conclusion of the proceedings which the Post desired to attend.  Finally, the court failed to provide an adequate statement of the reasons for its closure decisions. . . .    The[] [court's] brief statements failed to include specific findings concerning the interests at stake, a discussion of the applicable constitutional principles, or a consideration of possible alternatives to closure.

*Id.* at 392.  The court went on to emphatically reject the Government's national-security argument offered to support the denial of these procedural rights, recognizing that the required procedures in no way jeopardized the asserted interests:

> All that the district court must do is to provide interested persons with notice of the government's motion and an opportunity to voice their objections.  There is no reason to fear that these procedures would in

> themselves alert the public to the substance of the information sought
> to be kept secret.

*In re Washington Post Co.*, 807 F.2d at 391 (footnote omitted).  This case presents

exactly the same problems; the district court's decision here to simply forego any

notice and proceed with a secret hearing was in error and should be reversed, as

should its refusal to hear the Chronicle's objections to closure at the hearing.

While this appeal focuses on the procedural infirmities in the district court's

actions discussed above, the substantive question of whether closure could have

been justified also warrants scrutiny.  Significantly, this is not the typical case

where closure is premised on the worry that ***information*** discussed at a hearing

would jeopardize government investigations, individuals' Sixth Amendment rights,

or result in some other serious substantive harm requiring subordination of First

Amendment guarantees.  Instead, this is a case where the Government appears to

have taken the position that it was unable to provide adequate security to protect

against an attack on the courthouse in the absence of total secrecy.  The district

court determined, based on sealed argument and affidavits, that the mere docketing

of the sentencing hearing would "result in a substantial probability that the

defendant, court personnel, United States Marshals personnel, other courthouse

personnel, and the general public will be placed in imminent danger."  (R.E. Tab L

at R. USCA5 311)  The clear underpinning of this conclusion is that the

Government must have claimed that the Gulf cartel that Defendant previously ran would attack the proceeding knowing that Defendant would be present.

First, the public record is devoid of any factual basis to support the court's vague conclusion of "imminent danger" to the "general public." The public record contains no information (beyond the court's summary conclusion) to even suggest that the Government presented credible evidence that such an attack was likely or even contemplated, much less "imminent" and likely to be successful absent wholesale closure and manipulation of notice in the public docket. Mere conjecture that an attack was possible is not sufficient to justify closure. *See In re Providence Journal Co.*, 293 F.3d 1, 13 (1st Cir. 2002) ("[T]he First Amendment right of public access is too precious to be foreclosed by conclusory assertions or unsupported speculation."); *United States v. Martin*, 746 F.2d 964, 972 (3d Cir. 1984) ("[S]peculative threats to [the fair-trial] right have never been sufficient to overcome either first amendment rights to attend and report on trials or the common law right of access to trial materials.") (citations omitted); *cf. Tinker v. Des Moines Indep. Community School Dist.*, 393 U.S. 503, 508 (1969) ("[U]ndifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression."), *quoted in Cohen v. California*, 403 U.S. 15, 23 (1971).

Second, the mere prospect of lawless behavior does not automatically trump the First Amendment. America's First Amendment jurisprudence was founded on conflicts between the First Amendment guarantees and efforts to maintain public order. Over time, the conflict has been resolved overwhelmingly in favor of the First Amendment. The roots of this can be traced to Justices Holmes and Brandeis, whose opinions form the foundation for the law today.[7] That law is clear that threats of violence or lawlessness do not justify suppression of First Amendment rights in all but the most pressing circumstances. *See Hess v. Indiana*, 414 U.S. 105, 107-09 (1973) (reversing on First Amendment grounds conviction based on war protester's exclamation that the protesters would "take" the street); *Brandenburg v. Ohio*, 395 U.S. 444, 447-48 (1969) ("[T]he constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or

---

[7]    *See Abrams v. United States*, 250 U.S. 616, 630 (1919) (Holmes, J., dissenting) ("I think that we should be eternally vigilant against attempts to check the expression of opinions that we loathe and believe to be fraught with death, unless they so imminently threaten immediate interference with the lawful and pressing purposes of the law that an immediate check is required to save the country."); *Whitney v. California*, 274 U.S. 357, 376-77 (1927) (Brandeis, J., concurring) ("Fear of serious injury cannot alone justify suppression of free speech and assembly. . . . Those who won our independence by revolution were not cowards. . . . They did not exalt order at the cost of liberty. . . . Only an emergency can justify repression. Such must be the rule if authority is to be reconciled with freedom. Such, in my opinion, is the command of the Constitution.") (footnote omitted).

produce such action."). What these cases demonstrate is that concerns over safety or public order cannot override First Amendment rights unless there is evidence that imminent lawless action resulting in serious harm will occur absent restriction of First Amendment rights.

Finally, even if the safety concerns here were more than speculative, they could not have justified the actions of the trial court here. Surely there were security measures short of secret proceedings that could have ensured safety. The notion that a United States court supported by the United States' unparalleled security forces including the Marshals service cannot provide a safe location for criminal proceedings without conducting those proceedings entirely in secret is both unbelievable and disturbing. Indeed, the court granted the Government's motion to transfer the case from Brownsville to Houston precisely because the Government represented that Houston was the "best option for USMS personnel to safely, adequately, and securely meet all the needs and perform all the duties associated with the trial." (*See* R.E. Tab J at R. USCA5 80, 85) If the Government and USMS believed that even the Houston courthouse could not be secured, they should have moved to transfer the case to another venue.

Contrary to what took place in this case, the United States has a rich and proud tradition of conducting public criminal trials and sentencing proceedings.

This includes cases throughout the country's history involving notorious

defendants backed by dangerous organizations.

Notable examples include:

- ***accused terrorists***:

    o Zacarias Moussaoui, who participated in the 9/11 plot, was

      sentenced in open court in the U.S. District Court for the

      Eastern District of Virginia.  No. 1:2001-cr-00455 (E.D. Va.);

      *see* Neil A. Lewis, *One Last Appearance, and Outburst, From*

      *Moussaoui*, N.Y. Times, May 5, 2006, *available at*

      http://www.nytimes.com/2006/05/05/us/05moussaoui.html

      (recounting sentencing proceedings).[8]

    o Those responsible for the 1998 American embassy bombings

      in Kenya and Tanzania were openly tried and sentenced in the

      Southern District of New York.  No. 1:1998-cr-01023

      (S.D.N.Y.); *see* Phil Hirschkorn, *Four embassy bombers get*

      *life*, CNN, Oct. 21, 2001,

      http://edition.cnn.com/2001/LAW/10/19/embassy.bombings/

      (recounting sentencing proceedings).

---

[8]    The Court can take judicial notice of the fact of these proceedings.  *See* Fed.
R. Evid. 201.

- o Ramzi Yousef, who planned the 1993 World Trade Center bombing was openly tried and sentenced for his role in a plot to assassinate the Pope in the Southern District of New York. No. 1:1993-cr-00180 (S.D.N.Y.); *see 'Proud terrorist' gets life for Trade Center bombing*, CNN, Jan. 8, 1998, http://www.cnn.com/US/9801/08/yousef.update/ (recounting sentencing proceedings).

- *organized-crime bosses*:

  - o Al Capone was openly tried and sentenced in the Northern District of Illinois. *See* Meyer Berger, *Capone Convicted of Dodging Taxes; May Get 17 Years*, N.Y. Times, Oct. 17, 1931, *available at* http://www.nytimes.com/learning/general/onthisday/big/1017. html (recounting trial and conviction).

  - o John Gotti was openly tried and sentenced in the Eastern District of New York.  No. 1:1990-cr-01051 (E.D.N.Y.); *see* Arnold H. Lubasch, *Gotti Sentenced to Life in Prison Without the Possibility of Parole*, N.Y. Times, June 24, 1992, *available at* http://www.nytimes.com/1992/06/24/nyregion/gotti-

35

sentenced-to-life-in-prison-without-the-possibility-of-

parole.html (recounting sentencing proceedings).

- ***accused drug cartel leaders***:

  o Juan Garcia Abrego, who like Cardenas-Guillen, was a "former

    head of the Gulf Cartel," was openly tried and sentenced in

    Houston in the mid-1990s.  No. 4:1993-cr-00167 (S.D. Tex.);

    *see* R.E. Tab J at R. USCA5 78 (discussing Abrego

    proceedings); *United States v. Garcia Abrego*, 141 F.3d 142

    (5th Cir. 1998); Terri Langford, *Life in jail for drug lord*,

    Associated Press, Feb. 1, 1997, *available at*

    http://www.brownsvilleherald.com/common/printer/view.php?

    db=brownsville&id=23141 (recounting sentencing

    proceedings))

  o Jorge Mario Paredes-Cordova, "designated by the United

    States Department of Justice as one of the world's most

    significant drug kingpins," was tried and sentenced in open

    court in the Southern District of New York.  No. 1:2003-cr-

    00987 (S.D.N.Y.); *see Manhattan Federal Jury Finds Cocaine*

    *Kingpin Guilty on Narcotics Importation and Distribution*

    *Charges*, U.S. Attorney's Office, Nov. 6, 2009, *available at*

http://www.justice.gov/usao/nys/pressreleases/November09/pa
redescordovajorgemarioverdictpr.pdf; Bruce Golding,
*Guatemalan drug kingpin cries after getting 31 years in the
slammer*, N.Y. Post, Apr. 16, 2010, *available at*
http://www.nypost.com/p/news/local/manhattan/guatemalan_dr
ug_kingpin_cries_after_Mb7qndOT8kdColDpvObzHI
(recounting sentencing proceedings).

o   Jesus Vicente Zambada-Niebla, an allegedly high-ranking
member of the Mexican Sinaloa drug cartel is currently being
prosecuted in the Northern District of Illinois in open
proceedings.  No. 1:2009-cr-00383 (N.D. Ill.); *see* Mike
Robinson, *Jesus Vincente Zambada-Niebla Pleads Not Guilty:
Alleged Mexican Cartel Leader Denies Charges*, Associated
Press, Feb. 23, 2010, *available at*
http://www.huffingtonpost.com/2010/02/23/jesus-vincente-
zambadanie_n_473561.html (recounting plea hearing).

When appropriate, the courts in these cases employed additional security and
screening to ensure safety while preserving the nation's constitutional values in

holding open proceedings, just like USMS pledged to do in this case.[9]  *See Court Security*, U.S. Marshals Service, *at* http://www.usmarshals.gov/duties/courts.htm (last visited May 14, 2010) (noting use of "additional security resources for 117 trials including the African Embassies Bombing Trial" in 2002); R.E. Tab J at R. USCA5 85.

Without a credible explanation for why secrecy was necessary in this case, the public is left to question the parties' motives in conducting the proceedings in the dark.  *See Richmond Newspapers*, 448 U.S. at 571-72.  Indeed, even the district court noted that she was reluctant to impose only a 25-year sentence given Defendant's "legacy to [his] country, to our communities on both sides of the border, and to society" is "[k]idnappings, extortion, gun battles in the streets, a desperate economy, [and] innocence lost."  (R.E. Tab L at R. USCA5 317; *see also* R.E. Tab J at R. USCA5 74-75 (discussing Defendant's actions))  Whether or not the sentence fits the crimes, secrecy can erode public confidence in the criminal-justice system.  Even where a result is perfectly justified, "where the trial has been concealed from public view an unexpected outcome can cause a reaction that the system at best has failed and at worst has been corrupted."  *Richmond Newspapers*,

---

[9]    If necessary, the Marshals Service could have requested military assistance to secure the courthouse.  *See generally United States v. Gerena*, 649 F. Supp. 1179 (D. Conn. 1986) (finding no statutory or constitutional *posse comitatus* violation when Marshals used military equipment and personnel in transporting a defendant to a courthouse).

448 U.S. at 571.  The secrecy of the proceedings in this case also undermined the "important prophylactic purpose" of "open processes of justice" in "providing an outlet for community concern, hostility, and emotion."  *Richmond Newspapers*, 448 U.S. at 571; *see also id.* ("The crucial prophylactic aspects of the administration of justice cannot function in the dark; no community catharsis can occur if justice is done in a corner or in any covert manner.") (quotations and alteration omitted).  The district court's orders and actions, if left undisturbed, will undermine public confidence in the criminal-justice system.  They should be reversed.

## CONCLUSION

For the reasons discussed above, the Chronicle respectfully asks that this Court:  (1) reverse the district court's general order denying the public notice of contemplated closure and an opportunity to be heard on such closure; (2) reverse the district court's specific decision to deprive the public of notice of the sentencing hearing; and (3) reverse the district court's order denying the Chronicle's motion made at the sentencing hearing seeking an opportunity to be heard regarding closure of that hearing.

Respectfully submitted,

/s/ Ravi V. Sitwala

Jonathan R. Donnellan
Ravi V. Sitwala
**The Hearst Corporation**
300 West 57th Street
New York, New York 10019
(212) 649-2020

ATTORNEYS FOR APPELLANT
    HEARST NEWSPAPERS, LLC d/b/a
    HOUSTON CHRONICLE

## <u>CERTIFICATE OF SERVICE</u>

**No. 10-40221**
**United States of America v. Cardenas-Guillen v. Hearst Newspapers, L.L.C**

I hereby certify that, on this the 19th day of May, 2010, the foregoing Brief of Appellant has been filed through the ECF system of the United States Court of Appeals for the Fifth Circuit, and that counsel of record for the parties have been served in the manner described below.

Service was made by electronic means through the Notice of Docket Activity from the ECF system to the following registered ECF user:

> Amy Howell Alaniz
>    Assistant U.S. Attorney
> U.S. Attorney's Office
> Southern District of Texas
> Suite 600
> 1701 W. Highway 83
> McAllen, TX 78501-0000

> Counsel for Plaintiff-Appellee United States of America

Service of two copies of the foregoing Brief of Appellant was made by mail to the following counsel:

> James Lee Turner
>    Assistant U.S. Attorney
> U.S. Attorney's Office
> Southern District of Texas
> P.O. Box 61129
> Houston, TX 77208-1129

> Counsel for Plaintiff-Appellee United States of America

> Crispin Quintanilla, III
> Garcia, Quintanilla & Palacios
> 5526 N. 10th Street
> McAllen, TX 78504-0000

41

Michael Wayne Ramsey
2120 Welch
Houston, TX 77019-0000

Roberto Jose Yzaguirre
Yzaguirre & Chapa
Suite A
6521 N. 10th
McAllen, TX 78504-0000

Counsel for Defendant-Appellee Oziel Cardenas-Guillen

_____/s/ Ravi V. Sitwala_____
Ravi V. Sitwala
Attorney for Appellant

Dated:  May 19, 2010

## <u>CERTIFICATE OF COMPLIANCE</u>

1.   This brief complies with the type-volume limitation of FED. R. APP.

P. 32(a)(7)(B) because this brief contains 9,424 words, excluding the parts

of the brief exempted by FED. R. APP. P. 32(a)(7)(B)(iii).

2.   This brief complies with the typeface requirements of FED. R. APP.

P. 32(a)(5) and the type style requirements of FED. R. APP. P. 32(a)(6)

because this brief has been prepared in a proportionally spaced typeface

using Microsoft Office Word 2003 in 14-point Times New Roman Font.

3.   Required privacy redactions have been made pursuant to 5TH CIR. R.

25.2.13.

4.   This electronic submission is an exact copy of the paper document pursuant

to 5TH CIR. R. 25.2.1.

5.   This document has been scanned for viruses with the most recent version of

a commercial virus scanning program and is free of viruses.

> /s/ Ravi V. Sitwala
> Ravi V. Sitwala
> Attorney for Appellant

> Dated:  May 19, 2010